IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS |
| | ) | UNDER CHAPTER 9 |
| | ) | |
| VILLAGE OF ALORTON, | ) | Bk. No.:  05-30055 |
| | ) | |
| DEBTOR(S). | ) | |

**DISCLOSURE STATEMENT**

I.  INTRODUCTORY STATEMENT

On January 21, 2005, the Village of Alorton ("Debtor") filed a Voluntary Petition for Reorganization pursuant to Chapter 9 of the United States Bankruptcy Code (the "Code") with the United States Bankruptcy Court for the Southern District of Illinois (the "Court").  This Disclosure Statement is submitted pursuant to Section 1125 of the United States Bankruptcy Code and in connection with the Plan of Adjustment filed by the Village of Alorton, as Debtor in Possession. The Disclosure Statement must be approved by the Court as containing adequate information to allow a holder of a claim against the Debtor to make an informed decision on the acceptance or rejection of the Plan of Adjustment (the "Plan").

II.  DEBTOR'S HISTORY, OPERATION, AND REORGANIZATION

The Village of Alorton filed this Chapter 9 proceeding after many years of economic decline, and the failure to adjust the spending habits of th Village while there was a steady decline in population and revenues.  The loss of over 20,000 jobs from the closure of Alcoa Aluminum in the 1960's and the Cahokia Downs Race Track which closed in 1978, caused a tremendous loss of revenues along with the loss of Federal and State sources that the Village had dependant upon for many years.  In recent years various individuals and employees have filed lawsuits that compounded that problem of the declining tax base and loss of residents.  If this community is to rebound and continue to serve the remaining residents and businesses as a going concern, then it must get a fresh start with leadership that recognized the mistakes of the past and is willing to make tough financial decisions based upon what is best for the Village and not what is best for their own political future.  There must be a new financial direction that works within the financial restraints of a slow moving economy and adjusts expenses accordingly with the loss of revenues due to an exodus of residents, jobs, and other businesses form the community.

The Village of Alorton was incorporated in 1944, as the Village of Alcoa and was primarily a heavy industry center.  Its residents to avoid being annexed by the City of East St. Louis, which is located immediately to the northwest, incorporated the Village.  The residents were also trying to avoid being swallowed up by the City of Centreville, which surrounds Alorton on the southwest, southeast and northeast.

When the City was incorporated the principal business in Alorton was the Alcoa Aluminum plant. This facility employed nearly 20,000 people during the 1940's. During the late 1940's Alcoa Inc. approached the Village of Alorton and requested that the Village change its name to Alorton from Alcoa due to the fact that much of the mail for the Village and the Aluminum plant were being confused. Alcoa, Inc. Offered to buy the re-named Village a fire truck in consideration for changing its name. The Alcoa plant closed in the 1960's eliminating the employment opportunities that had existed at the facility.

During the 1950's, the Cahokia Downs Race Track was established and built on along IL Route 15 (Missouri Avenue) just west of IL Route 157. The racetrack was another boom for jobs and revenues for the Village until it closed in 1978. After the track closed the facility and surrounding 140 acres began to deteriorate. The Cahokia Downs' Grandstands were eventually demolished in 1989 due to its advanced state of dilapidation and potentially dangerous conditions. The Village has never fully recovered from these two major set backs to the economy.

From 1950 to 1970 the population of Alorton increased form 1,547 to 3,573 residents. However, during the 1970's the population decreased significantly to 2,237 residents. The population in St. Clair County also decreased by over 6% between 1970 and 1980 from 285,591 to 267,531 persons. The 1985 estimated population of Alorton was 2,700 people. The black population of Alorton increased significantly between 1950 and 1980 from 584 to 2,062 representing over 90% of the total 1980 population. The median family income in 1979 was $9,250.00 as compared to County median family income of $19,239.00, the SMSA median income of $21, 773.00 and the U.S. median income of $19,908.00. This placed Alorton at less than 50% of the national median family income.

In 1980 over 17% of those in the work force in Alorton were unemployed. This is consistent with the pattern of unemployment rates for residents in Southwestern Illinois, which has consistently had higher unemployment rate than the State of Illinois as a whole. The lack of employment opportunities continues to plague the Village of Alorton. The Village of Alorton is predominantly a female single family headed household community. In 1980, median owner occupied home value was $11,800.00. While the number of housing units increased during the 1950's, 1960's, and 1970's saw a loss of housing units of approximately 25%, resulting in a return to a level of housing units slightly above the 1950 level.

In 1990 a glimmer of hope appeared on the horizon, in the form of $6.1 million development that proposed to develop an outdoor amphitheater at the Old Cahokia Downs Race Track. Before the project could get off the ground, in 1991 the Riverport Amphitheater was developed in Earth City Missouri, which eventually caused the great plan of the rebirth of Alorton to fade into the sunset. That facility is now known as the UMB Bank Pavilion.

In March 1999 the U.S. Attorney's Office convicted a former Mayor of embezzling over $140,000.00 form the Village over a seven-year period. From 2003 until 2005, the Village was receiving a repayment of approximately $1,175.00 per month until recently, when the former Mayor filed bankruptcy. Most of those funds were paid to partially settle the lawsuit filed against the village and the former mayor. The suit is still pending against the Village.

After years of economic decline due to loss of jobs, industry and an exodus of families to the suburban ring of St. Clair County. This lead to a severe decrease in population and a loss in Federal and State revenues, which make up over 80% of the Village's sources of funds. According to the latest 2000 Census the population has decreased to 2,749 residents, from it's peak of 3,573 according the 1970 Census.

The 2,749 residents, with a median income of $17,860.00, compared to the national average of $41,994.00 of this once prosperous town currently rely on a staff of thirty (30) people to conducts its day-to-day operations. In addition the mayor and Clerk, the Village employs two (2) clerks, one (1) Fire Chief, an all-volunteer fire department; two (2) cod inspectors, and four (4) street department workers, (1) part-time Village administrator. The responsibility of guarding the lives and safety of the Village's residents and businesses falls to one (1) Police Chief, four (4) full time and fourteen (14) part-time police officers.

In 2000 an economic evaluation the Village of Alorton reflected the financial straits of this community. The median household income is $17,860.00, which ranked below the Illinois state average. The median house value was %19,500.00, which ranked significantly below the Illinois state average.

In 2003 the city lost it's only remaining supermarket, Tom Boys, because it no longer could compete with the larger and more service oriented major supermarket chains. The loss of that store alone created a $50,000 annual loss in sales and other tax revenues for the Village.

In 2006 it is expected that a new Phillip 66 Service Station and Flying J Truck Plaza under construction and scheduled to open in early summer will offer some hope in that the current sales tax revenues of the city average about $2,500.00 monthly. Sales tax revenues should increase significantly by the end of the 2006 or beginning of the 2007 calender years.

The Village is also working with a housing developer to secure new single-family housing that will also provide some growth in real estate taxes in future years. There will be 50 new single-family homes constructed in early 2006 that will generate some real estate taxes that will be available in the summer and fall of 2007.

At this time there are a number of judgments against the Village Of Alorton. According to records received from the Village's corporate counsel, the following is a list of judgments against the Village of Alorton: Taymond Freeman received a judgment for $978,874.40 for excessive force and violation of civil rights by a municipal employee. Thomas Howard, Gregory Jonas and James Thomas received a judgment against Callie Mobley and the Village of Alorton. Thomas Howard is to receive $56,179.50, Gregory Jonas is to receive $37,235.25, and James Thomas is to receive $37,235.25. Brian K. Phillips c/o B. Jay Dowling has agreed to settled for $7,500 in his case against the Village of Alorton.

### III. ASSETS OF THE DEBTOR

The assets of the Debtor consist primarily of the following:

| | | |
|---|---|---:|
| 1. | 4821 Bond Ave, Alorton, IL - Village Hall/Police Dept./Post Office | $72,000.00 |
| 2. | 4821 Bond Ave, Alorton, IL - Fire Department | $100,400.00 |
| 3. | 5491 Bond Ave, Alorton, IL - Alorton Park | $30,000.00 |
| 4. | 4819 Bond Ave, Alorton, IL - City Garage | $17,200.00 |
| 5. | Checking Account - GENERAL FUND as of 04/31/05 | $10,550.00 |
| 6. | Checking Account - PAYROLL ACCOUNT as of 04/31/05 | $7,600.00 |
| 7. | Furnishings at Village Hall | $12,800.00 |
| 8. | Furnishings at Fire Department | $2,600.00 |
| 9. | Furnishings at Police Station | $4,800.00 |
| 10. | Fire Equipment | $9,600.00 |
| 11. | Police Equipment | $13,300.00 |
| 12. | 2005 Ford Crown Victoria (Mayor's Office) | $22,000.00 |
| 13. | 1996 Chevy Caprice (Police Department) | $2,450.00 |
| 14. | 2001 Ford Crown Victoria (Police Vehicle) | $4,450.00 |
| 15. | 2002 Ford Crown Victoria (Police Vehicle) | $5,260.00 |
| 16. | 2005 Ford Crown Victoria (4 Police Vehicle) | $74,000.00 |
| 17. | 1996 Chevy Lumina (Police Vehicle) | $2,100.00 |
| 18. | 2004 Dodge intrepid (Police Vehicle) | $9,600.00 |
| 19. | 2005 Ford F-350 Dump Truck (Public Works) | $30,000.00 |
| 20. | 1998 Ford F-150 Pick Up Truck (Public Works) | $3,250.00 |
| 21. | 2000 Case Back Hoe (Public Works) | $14,500.00 |
| 22. | 2002 Ford Tractor and Bush Hog (Public Works) | $7,500.00 |
| 23. | 1996 Ford Tractor and Bush Hog (Public Works) | $2,850.00 |
| 24. | 2004 Zero Turn Riding Lawnmower (Public Works) | $3,650.00 |
| 25. | 2004 John Deere Tractor and Grass cutter | $7,500.00 |
| 26. | 1993 Freightliner Fire Truck | $59,000.00 |
| 27. | 1999 Kenwood Pumper Fire Truck | $76,500.00 |

**TOTAL:** **$605,460.00**

### IV. LIQUIDATION ANALYSIS

In Chapter 9 bankruptcy proceedings, a municipal debtor's liquidation cannot be forced. In other words, liquidation is not an option for this Debtor. However, a brief review of the Debtor's assets show that liquidation would be impractical in this case.

Most of the hard assets of the Debtor amount to approximately $605,460.00 in value. However most of these assets consist of vehicles and equipment, which depreciate at a value faster than they can be paid off.

The Debtor's liquid assets as reflected in the Section III of this Disclosure Statement are bank accounts which continually fluctuate. These accounts are used to keep the Village of Washington Park in an operating condition. Most of these accounts hold State and Federal funds specifically designated for programs in the area.

Therefore, there is no property which can be liquidated to pay off the debts. All plans for reduction of debts comes from the Village's future income.

## V. CASH FLOW ANALYSIS

INCOME

    Estimated Average Gross Monthly Income    $66,100.00

EXPENSES
    Estimated Average Monthly Expenses:    $66,100.00

| # | Item | Amount |
|---|---|---:|
| 1. | Net Employee Payroll | 17,500.00 |
| 2. | Elected Officials Payroll | 4,300.00 |
| 3. | Zoning Board of Appeals | 350.00 |
| 4. | Dispatching Services | 2,000.00 |
| 5. | IMRF Retirement Fund | 1,750.00 |
| 6. | Payroll Taxes/FICA/Unemployment Taxes | 6,500.00 |
| 7. | Worker's Compensation Insurance | 1,500.00 |
| 8. | Health Insurance | 3,450.00 |
| 9. | Telephone | 600.00 |
| 10. | Gas/Electric | 900.00 |
| 11. | Water/Sewer | 150.00 |
| 12. | General Liability Insurance | 1400.00 |
| 13. | Office Expenses and Supplies | 900.00 |
| 14. | Vehicle Repairs and Maintenance | 1,000.00 |
| 15. | Gasoline and Oil | 4,000.00 |
| 16. | Vehicle Insurance | 4,500.00 |
| 17. | Vehicle Payments and Leases | 3,000.00 |
| 18. | Office Equipment Rental & Leases | 800.00 |
| 19. | Legal Fees | 1,750.00 |
| 20. | Accounting/Auditor | 2,500.00 |
| 21. | Professional Fees & Services | 1,800.00 |
| 22. | Membership Dues & Subscriptions | 500.00 |
| 23. | Contingency | 2,000.00 |
| 24. | Bankruptcy Payment Allocation | 3,000.00 |

    **TOTAL:**    $66,100.00

INDEPENDENT AUDITOR'S REPORT

Attached to this statement is an Independent Auditor's Report for the Village of Alorton as of the fiscal year ending April 30, 2003. This audit report includes numerous financial statements indicating the poor financial health of the Village of Alorton, including a combined statement of assets and liabilities for the fiscal year ending April 30, 2003. This independent auditor's report was completed in accordance with auditing standards generally accepted in the United States of America and financial audit standards contained in *Government Auditing Standards*, issued by the Comptroller General of the United States.

## VI. SUMMARY OF PLAN

A.  Description of Plan

The Debtor shall continue to operate as a municipality of the State of Illinois pursuant to all rules and statutes applicable there to. All of the assets set forth in Section 3 of this Statement shall continue to be held by the Debtor.

Payments under the Plan shall be made according to the treatment of the claims as set forth in Article 4 and Article 5. Regular monthly expenses shall be paid according to past practices. It is the Debtor's intent to pay off this Plan within the next ten (10) years. However, the Debtor will make additional payments when possible.

All of the assets of the estate shall vest in the Debtor upon Confirmation subject to the liens identified in Article 5.

B.  Classification of Claims

Class 1:   Class 1 consists of all governmental obligations of the Debtor, which are creditors holding unsecured priority claims.

Class 2:   Class 2 consists of all outstanding judgments and un-liquidated lawsuits against the Debtor.

Class 3:   Class 3 consists of all Allowed Claims of unsecured, non-priority creditors of the Debtor.

C.  Payments Under the Plan

Plan payments shall be made in accordance with Articles 4 and 5 of the Plan.

## VII. PURPOSE OF DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the holders of Claims and interest against the Debtor with sufficient information to enable them to make an informed judgment about the Plan. In the opinion of the Debtor, the information contained herein is material, important and

necessary for the holders of impaired claims to make an informed decision in exercising their right to vote for acceptance or rejection of the Plan as presently on file with the Court. Only holders of impaired claims are entitled to vote on the Plan. All other creditor classes are deemed to have accepted the Plan under the Bankruptcy Code.

*A COPY OF THE PLAN ACCOMPANIES THE DISCLOSURE STATEMENT. THE DEFINITIONS CONTAINED IN THE PLAN APPLY TO THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN. THE PLAN SHOULD BE REVIEWED FULLY IN CONNECTION WITH YOUR REVIEW OF THIS DISCLOSURE STATEMENT.*

Accompanying this Disclosure Statement are the following: (a) a copy of the Plan; (b) a copy of the notice fixing the time for the filing of acceptances or rejections of the Plan and for a hearing on confirmation of the Plan (the "Confirmation Hearing"); and (c) the ballot form to be used to indicate acceptances or rejection of the Plan. Please verify that all four of these items are enclosed. If any of these materials are not enclosed, or if your ballot form is damaged or lost, or if you have any questions concerning voting procedures, you may contact Stephen Clark, 104 S. Charles St., Belleville, Illinois, 62220.

## VIII. VOTING PROCEDURES

A.   General

The Court has directed that acceptances and rejections of the Plan be filed in writing by the holders of all claims against the Debtor entitled to vote, on or before the close of business as set forth on the Ballot and in the Notice accompanying the Disclosure Statement. A ballot for voting is enclosed herewith. Only the holders of impaired claims are entitled to vote on the Plan. Holders of such claims may do so by completing and mailing the enclosed ballot form to: Stephen Clark, 104 S. Charles St., Belleville, Illinois, 62220.

*IMPORTANT:* Your ballot must be received timely, or your vote will not be counted. Please mail your ballot now.

B.   Confirmation of the Plan

The Court has scheduled a confirmation hearing as set forth on Notice sent herewith to the holders of all claims against and interest in the Debtor. At the confirmation hearing, the Court will enter an order confirming the Plan (the "Confirmation Order") if sufficient acceptances of the Plan have been received by the holders of allowed impaired claims, and if conditions to confirmation of the Plan and statutory requirements have been met. If the Plan is confirmed, the Plan will be implemented commencing on the Effective date.

As the holder of an impaired claim against the Debtor, your vote on the Plan is important. In order for the Plan to be accepted and thereafter confirmed by the Court, it must be accepted or deemed accepted by each class of Claims and Interest contained in the Plan. A class of Claims has accepted the Plan if it has been accepted by creditors holding at least two-thirds (2/3) in amount and

more than one-half (½) in number of the allowed claims of such class held by creditors who have accepted or rejected the Plan. A class that is not impaired under the Plan is deemed to have accepted the Plan. Therefore, creditors holding claims in Class 1 are deemed to have accepted the Plan and shall not vote. Similarly, the Debtor is deemed to have accepted the plan due to the fact that it has proposed the Plan. The Debtor is only soliciting the acceptances of the holders of claims in Class 2, 3, 4, 5, 6, 7, 8 and 9. *CREDITORS WHO FAIL TO VOTE WILL NOT BE COUNTED IN THE CALCULATION OF WHETHER THEIR CLASS HAS ACCEPTED THE PLAN.*

### IX. INFORMATION PROVIDED HEREIN

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTOR UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. TO A LARGE EXTENT, THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT WAS OBTAINED FROM OTHER DOCUMENTS, INCLUDING DOCUMENTS FILED WITH THE COURT. NO STATEMENTS AS TO THE FINANCIAL CONDITION, MANAGEMENT, BUSINESS OPERATIONS OR PROFITABILITY OF THE DEBTOR IS AUTHORIZED EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN AS ACCURATE. HOWEVER, THE DEBTOR BELIEVES SUCH INFORMATION TO BE SUBSTANTIALLY ACCURATE AND BELIEVES THAT CREDITORS AND OTHER PARTIES IN INTEREST CAN REASONABLY RELY THEREON UNLESS OTHERWISE NOTED HEREIN. FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT, UNLESS OTHERWISE INDICATED.

ALL CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO CAREFULLY READ THIS DISCLOSURE STATEMENT IN ORDER TO FORMULATE AN INFORMED OPINION AS TO THE MANNER IN WHICH THE PLAN AFFECTS ALL CLAIMS AGAINST OR INTEREST IN THE DEBTOR AND IN THE CASE OF IMPAIRED CLAIMS, TO DETERMINE WHETHER TO ACCEPT THE PLAN. A COPY OF THE PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT. THE PLAN SHOULD BE READ CAREFULLY IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT.

THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT FOR DISTRIBUTION CONSTITUTES NEITHER AN ENDORSEMENT OF THE PLAN NOR A GUARANTY OF THE ACCURACY OF THIS DISCLOSURE STATEMENT.

### X. CONCLUSION - SOLICITATION OF ACCEPTANCES

The acceptances of all persons holding allowed claims in Classes 2, 3, 4, 5, 6, 7, 8 and 9 are hereby solicited to vote on the Plan of Reorganization proposed by the Debtor.

The Debtor believes that acceptance and confirmation of the Plan is in the best interest of all creditors of the Debtor and will result in the maximum recovery for all of the creditors of the Debtor.

Dated this _____ day of _____, 2006.

            COURTNEY, CLARK & ASSOC., P.C.

            /s/ Stephen R. Clark
            Stephen R. Clark   #00453439
            104 South Charles Street
            Belleville, IL 62220
            (618) 233-5900
            (618) 234-8028 - Facsimile
            Attorney for Debtor

## CERTIFICATE OF SERVICE

  The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause enclosing the same in an envelope addressed to such parties at the business address as disclosed by the pleadings of record herein, with postage fully prepaid, and by depositing said envelope in a U.S. Postal Service mailbox in Belleville, Illinois on the _____ day of May, 2006.

            /s/ Stephen R. Clark

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS |
| | ) | UNDER CHAPTER 9 |
| | ) | |
| VILLAGE OF ALORTON, | ) | Bk. No.:  05-30055 |
| | ) | |
| DEBTOR(S). | ) | |

**VERIFICATION OF DISCLOSURE STATEMENT**

    I hereby certify that the Disclosure Statement is true and correct to the best of my knowledge.

    Dated: _____  _____, 2006.

                                                                                    /s/ _____

Stephen R. Clark
Courtney, Clark & Associates, P.C.
104 South Charles Street
Belleville, IL 62220
(618) 233-5900
(618) 234-8028 - Facsimile
Attorney for Debtor